UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
EDWARD BOU-NASSIF, )
 )
      Plaintiff, )
 )
v. ) Case No. 15-cv-10066-LTS
 )
BANK OF AMERICA, N.A., et al., )
 )
      Defendants. )
)

ORDER ON MOTION FOR SUMMARY JUDGMENT (DOC. 67)

August 31, 2017

SOROKIN, J.

      After the Court dismissed the initial complaint in this case, see Doc. 23, Plaintiff Edward Bou-Nassif filed a verified Amended Complaint against Defendants Bank of America, N.A., and unknown agents of the company (collectively, "BANA"). Doc. 26. The Court dismissed as futile every count in the Amended Complaint except for Count One. Doc. 31 at 6. In that count, Plaintiff claims BANA violated Mass. Gen. Laws ch. 93A, § 2 (hereinafter, "93A"), which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," by incorrectly telling him that he would receive a loan modification and then ultimately foreclosing on his home on August 12, 2011. See Doc. 26 at 4. BANA has filed a Motion for Summary Judgment (Doc. 67). For the reasons that follow, the Court ALLOWS the Motion.

I.   STATEMENT OF FACTS[1]

Plaintiff had a home mortgage loan that, starting around March 2008, was serviced by Countrywide Home Loans Servicing, LP, which changed its name to BAC Home Loans Servicing, LP ("BAC") in April 2009. Doc. 69 at 2. On July 1, 2011, BAC merged with and into BANA. Id.

Plaintiff went into default on his home mortgage loan in January 2009. Id. He received notification of default the following month and failed to cure it. Id. After warning Plaintiff of foreclosure, BAC initiated foreclosure proceedings in July 2009. Id. at 2-3.

On February 4, 2010, BANA sent Plaintiff a proposed loan modification agreement, which Plaintiff did not accept. Id. at 3.

Around December 2010, Plaintiff asked BANA for "a chance to modify his [home mortgage] loan." Doc. 26 at 1. According to Plaintiff's under oath statements in his Amended Complaint, BANA told him "that he needed to be three months behind before" a loan modification application "would be accepted or processed." Id. Plaintiff alleges he "relied" on this representation by BANA "that it would renegotiate following [Plaintiff's] cessation of

---

[1] Facts in this section are either undisputed or, where in dispute, recounted in the light most favorable to Plaintiff, the non-moving party. City and County of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1769 (2015). The Court relies on BANA's Statement of Undisputed Material Facts (Doc. 69), which Plaintiff "adopts," Doc. 75-1 at 1; Plaintiff's verified Amended Complaint (Doc. 26); and Plaintiff's affidavit submitted in opposition to the instant Motion (Doc. 75-2). See Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991). The Court does not rely upon the 28 pages of phone records Plaintiff has submitted that purportedly show he was in regular contact with BANA in the weeks leading up to and shortly after the foreclosure of his home. See Doc. 75-3. Plaintiff has provided no guidance for interpreting these records and refers to them in his affidavit in only the most general sense. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting that judges "are not expected to be mindreaders" and that litigants have an obligation to spell out arguments "squarely and distinctly") (citations and internal quotation marks omitted). That said, the Court rejects BANA's suggestion that "paragraphs 2, 3, 4 and 7" of Plaintiff's affidavit may not be considered because they rely on the phone records. Doc. 78 at 3. Regardless of whether those records would be admissible at trial, Plaintiff is presumed to have personal knowledge about how often he was in touch with BANA agents and what he discussed with them; the mere fact that Plaintiff alludes to the phone records to bolster these allegations does not vitiate that presumption. See Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001) (affidavit statements based on personal knowledge "are properly considered for summary judgment purposes"). In any event, the phone records even if properly authenticated, ordinarily a relatively straightforward task, do nothing more than "corroborate" Plaintiff's under oath statements that he spoke with the BANA representative. Of course, Plaintiff's under oath statements stand on their own and do not require corroboration.

mortgage payment." Id. at 2. On February 4, 2010, BANA offered Plaintiff a loan modification. Doc. 69 at 3. Plaintiff failed to accept this modification. Id.

Later, Plaintiff was considered for another modification. On January 26, 2011, Plaintiff was notified in writing that his home mortgage loan did not qualify for a modification under the Home Affordable Modification Program ("HAMP").[2] Id.

In April 2011, Plaintiff repeatedly "sent an entire package of documents for consideration of a loan modification," but BANA rejected the package for procedural infirmities, such as out-of-order pages. Doc. 26 at 2.

On July 18, 2011, Plaintiff was again notified in writing that his mortgage loan did not qualify for a modification under HAMP. Doc. 69 at 3.

During the summer of 2011, according to his under oath statements in his Amended Complaint, Plaintiff "continued to answer questions to [BANA] agents," who "encouraged" him "that a modification would be forthcoming." Doc. 26 at 2. Plaintiff complied with all of BANA's requests for additional documentation, and BANA "constantly reassured" Plaintiff over the phone that "a modification would be obtained." Id. Plaintiff's summary judgment affidavit states that between July 18, 2011, when he received the second denial for a HAMP modification, and August 17, 2011, five days after BANA foreclosed on his home, he "was in communication with" a BANA representative named Mike "over 18 times working to clear up misunderstandings in my paperwork and to clarify the finances of my company and family."[3] Doc. 75-2 at 1. In the Amended Complaint, Plaintiff suggests that one of these

---

[2] HAMP is "a federal initiative that incentivizes lenders and loan servicers to offer loan modifications to eligible homeowners." Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 228 (1st Cir. 2013). It does not appear that the loan modification proposed in February 2010 was made pursuant to HAMP. See Doc. 69-1 at 22-23.

[3] Plaintiff does not state, in either the Amended Complaint or his affidavit, how many of the "over 18 times" he spoke with Mike were before the foreclosure took place and how many were after, a period during which Plaintiff does not allege he suffered any economic harm.

"misunderstandings" was "why [he] ha[d] two addresses," and that after he provided an answer "the agent was satisfied . . . [and Plaintiff] felt a modification would be approved." Doc. 26 at 2. Plaintiff provides no specific information about what else Mike asked him to clarify, what documentation he asked Plaintiff to provide, whether Mike was the only BANA representative with whom he spoke, what dates he received assurances of a loan modification, or the context in which BANA representatives "constantly reassured" him that he would receive a modification, notwithstanding the two written denials of modification he had received. Plaintiff alleges he relied upon the loan modification assurances of BANA representatives and chose not to take actions to stop impending foreclosure, "such as finding a potential buyer" for his home. Id. at 8.

According to the Amended Complaint, on August 11, 2011, a BANA representative named Manuk Mike Barsamyan[4] told Plaintiff that "the pending foreclosure on his property was suspended," as "negotiations and review of the file were going to be ongoing." Doc. 26 at 3; see also id. (stating that Plaintiff understood he "was under the HAMP procedures and a suspense of th[e] foreclosure action was to take place").[5] In contrast to this under oath statement, in his summary judgment affidavit Plaintiff states Mr. Barsamyan told him something else. Plaintiff's affidavit claims that, on August 11, 2011, Mr. Barsamyan "said that the modification was *approved* and that the foreclosure would be stopped." Doc. 75-2 at 1 (emphasis added); see also Doc. 75-1 at 4 (alleging that a BANA representative told Plaintiff twice on August 11, 2011, at 6:55 p.m. and at 8:41 p.m., "that the modification was *completed*") (emphasis added). In reliance on this statement, according to the affidavit, Plaintiff "did not attempt to seek out a

---

[4] It appears that Mr. Barsamyan and Mike, from the previous paragraph, are the same person. Compare Doc. 26 at 3 (claiming Mr. Barsamyan told Plaintiff on August 11, 2011, that the foreclosure was suspended) with Doc. 75-2 at 1 (claiming "Mike" told him on that date that foreclosure was suspended).

[5] This statement by Plaintiff indicates that the only type of loan modification he discussed with BANA during the summer of 2011 was a HAMP modification. Plaintiff does not allege that BANA representatives discussed any other type of loan modification with him.

4

lawyer to either get an injunction or to file for Bankruptcy to stop the foreclosure," nor did he "ask[] for more time to obtain other financing for the house." Doc. 75-2 at 1.

On August 12, 2011, BANA foreclosed on Plaintiff's home and sold it. Id.; Doc. 69 at 3. Mr. Barsamyan "admitted" to Plaintiff "that he and his office made a mistake in not notifying [BANA's] foreclosing department to stop the foreclosure and was attempting to correct this mistake." Doc. 26 at 3.

On October 18, 2011, BANA "acknowledge[d]" to Plaintiff "that a mistake had been made" but was "not sure what could be done." Id. Plaintiff and his family were thereafter evicted from the home. Id.

In sum, Plaintiff claims BANA violated 93A by telling him that "becoming in default of his mortgage would benefit him in the loan modification process," and by telling him that BANA representatives "would keep him advised of the status of his loan modification, but instead [doing] nothing and authoriz[ing] the foreclosure of [Plaintiff's] home." Id. at 4. Plaintiff alleges that, were it not for these statements upon which he reasonably relied, "he otherwise could have taken other actions to stop the foreclosure, such as finding a potential buyer." Id. at 8. Plaintiff further alleges he was harmed because, in reliance on Mr. Barsamyan's August 11, 2011, statements, he did not attempt to seek out a lawyer to get an injunction or to file for bankruptcy to stop the foreclosure, or ask for "more time to obtain other financing." Doc. 75-2 at 1.

II.     RELEVANT LAW

"[A] court may grant summary judgment only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Perez v. Lorraine Enterprises, Inc., 769 F.3d 23, 29 (1st Cir. 2014) (citing Fed. R. Civ. P. 56(a)). "A 'genuine' issue is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Id. (citation omitted). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted). "When considering the summary judgment record, all reasonable inferences are to be drawn in favor of the party opposing summary judgment, . . . just as all disputed facts are viewed in the light most favorable to him." Thompson v. Cloud, 764 F.3d 82, 87 (1st Cir. 2014) (citation, internal quotation marks, and modifications omitted).

That said, where "the non-movant has the burden of proof on a critical issue and the evidence that she proffers in opposition to summary judgment is so vague that she could not prevail at trial, the motion must be granted." Perez, 247 F.3d at 318 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)); see also Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) ("To defeat a motion for summary judgment, 'evidence offered by the non-movant must be significantly probative of specific facts.'") (quoting Perez, 247 F.3d at 317). An affidavit "must be sufficiently specific to support the affiant's position," and "[s]tatements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous" to "receive weight at the summary judgment stage." Id. at 316. Thus, in Perez, a civil RICO case against Volvo Car Corporation ("Volvo"), the First Circuit rejected consideration, at the summary judgment stage, of a statement by a former manager of a Volvo dealership stating that he knew, based on his "personal discussions with various Volvo

6

representatives," that Volvo was aware car stickers had fraudulent information, because this statement was "totally lacking in specificity about the identity of th[ose] Volvo representatives, . . . when those alleged conversations occurred, what was said, how Volvo knew" about the fraud, and how the general manager knew the extent of Volvo's knowledge. Id. at 316.

As previously stated, 93A "authorizes consumers to sue for . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." Cooper v. Charter Comms. Entertainments I, LLC, 760 F.3d 103, 111 (1st Cir. 2014) (citation and internal quotation marks omitted). "In considering whether a particular act or practice violates the unfairness prong of Chapter 93A, Massachusetts courts assess: (1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers . . . ." Id. (citations and internal quotation marks omitted). Intentional misrepresentation provides a "basis for Chapter 93A liability." Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996) (citation omitted). "[N]egligent misrepresentations . . . give rise to ch. 93A liability only if they are 'extreme' or 'egregious.'" Baker v. Goldman, Sachs & Co., 771 F.3d 37, 54 (1st Cir. 2014) (quoting Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 62 (2004)). That said, "negligent mispresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice under [93A]." Marram, 442 Mass. at 62 (citations and internal quotation marks omitted).

III. DISCUSSION

BANA argues that, even assuming its agents told Plaintiff in December 2010 that going into default on his monthly mortgage payments would benefit him in the loan modification

7

process – i.e., "that he needed to be three months behind" for a modification application to be considered – there is no chance Plaintiff could have relied on that statement, since he was in continuous default on his mortgage payments since January 2009, well over three months before December 2010. Doc. 68 at 3. Plaintiff does not bother to respond to this argument in his Opposition. See Doc. 75-1. The Court finds the argument meritorious and STRIKES, as a basis for the 93A claim, Plaintiff's allegation that he relied upon BANA's December 2010 statement.

BANA also argues more generally that "the facts before this Court" do not support a 93A claim. Doc. 68 at 8. BANA states: "Plaintiff's allegations regarding a failure to process and consider a loan modification, without more, cannot form the basis of a Chapter 93A claim against BANA under Massachusetts law, particularly since the summary judgment evidence presented by BANA shows that Plaintiff . . . was informed in writing at least twice in 2011 that he did not qualify for a modification under HAMP." Id. at 9-10. Plaintiff counters: "Because . . . Bank of America's dialogue with Bou-Nassif's claims [sic] is at issue, summary judgment is inappropriate." Doc. 75-1 at 3. Plaintiff further states that BANA's "failure to give due consideration to the number of calls made, eighteen, . . . and documents requested to modify this loan, and then to say that the loan has been approved but failing to stop the foreclosure is on its own deceptive and unfair." Id. at 4.

The Court need not decide whether a promise by BANA to modify Plaintiff's loan or such a statement by a BANA representative would suffice in this case to support a Chapter 93A claim. Here, Plaintiff offers no evidence of any such promise or statement until August 11, 2011 at 6:55 p.m, the evening before the foreclosure sale. This statement fails for two separate and independent reasons. First, Plaintiff made a prior materially different under oath statement regarding the contents of this call. Plaintiff may not revise his testimony in direct contradiction

8

to an earlier under oath statement. See Torrech-Hernandez v. General Electric Co., 519 F.3d 41, 47 (1st Cir. 2008) ("[A] party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony[.]") (citation and internal quotation marks omitted). Second, Plaintiff must establish injury from the statement beyond the deception itself. See Shaulis v. Nordstrom, Inc., 865 F.3d 1, 10 (1st Cir. 2017) ("[L]egally cognizable injuries under Chapter 93A must involve objective, identifiable harm that goes beyond the deception itself.") (citations and internal quotation marks omitted); see also Keenan v. Wells Fargo Bank, N.A., __ F. Supp. 3d __, 2017 WL 1197741, at *6 (D. Mass. 2017) ("[V]ague assertions of economic damages do not 'raise a right to relief above the speculative level.'") (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This he has not done. The foreclosure was scheduled for and occurred the day after the statement. Despite the period provided to take discovery and the time to oppose the pending motion, Plaintiff offers no evidence or argument that he would have prevailed upon a motion for injunctive relief or evidence that he would have obtained financing elsewhere. His conclusory assertions to the contrary in his affidavit are insufficient to establish injury or support, on this record, a reasonable inference of injury. Plaintiff has advanced nothing else to establish injury flowing from the deception on August 11, 2011.[6] Thus, the statements made on August 11th cannot support the 93A claim under either the "loan approved" version of the phone call described in the affidavit or the "foreclosure suspended" version of the phone call described in the Amended Complaint.

Plaintiff has not provided "sufficiently specific" information to support any other basis for his 93A claim. Perez, 247 F.3d at 316. For example, he has provided scant information to

---

[6] Plaintiff and his family lost their home in foreclosure on August 11th and a few months later in the middle of the winter were evicted. Plainly, they suffered. Plaintiff does not, however, have evidence that this suffering resulted from the statements he says Mr. Barsamyan made on August 11th.

9

support the claim that BANA promised him a loan modification at any point between July 18, 2011, and the evening of August 11, 2011. Rather, he merely states in the Amended Complaint that, during the "summer of 2011," BANA representatives "encouraged" and "constantly reassured" him that he would receive a modification. Doc. 26 at 2. Neither the Amended Complaint nor Plaintiff's affidavit states when exactly those assurances were made, the context in which they were made, or the identity of the representatives. See Perez, 247 F.3d at 316-17. Instead, the only communications between July 18, 2011, and August 11, 2011, that Plaintiff has described in any detail are (1) his attempts to "clear up misunderstandings in [his] paperwork and to clarify the finances of [his] company and family," and (2) his explanation to a BANA employee about why he had two addresses. Doc. 26 at 2; Doc. 75-2 at 1. Thus, Plaintiff's allegation that he was "constantly reassured" during the summer of 2011 that he would receive a loan modification is "simply too amorphous" to "receive weight at the summary judgment stage," and "so vague that [Plaintiff] could not prevail at trial." Perez, 247 F.3d at 316, 318.

Similarly, Plaintiff has failed to provide any specific facts to support his claim that BANA broke a promise to "keep him advised of the status of his loan modification," and instead "did nothing." Doc. 26 at 4. Plaintiff does not offer a single specific instance when Mr. Barsamyan or any other BANA representative "did nothing" or failed to keep him advised of his loan modification status.[7] See Perez, 247 F.3d at 316-17. Thus, Plaintiff's claim that BANA failed to keep him advised of his loan modification status is also too vague to serve as a basis for holding BANA liable under 93A. See id. at 318.

---

[7] By Plaintiff's own account, he was in regular contact with Mr. Barsamyan regarding his loan modification application, "working to clear up misunderstandings . . . and to clarify [his] finances." Doc. 75-2 at 1.

10

IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 67) is ALLOWED and this case is DISMISSED.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge